Mr. Wellman is a firefighter. He is a member of the St. Louis Fire Department.  Mr. Wellman is a member of the St. Louis Fire Department. He had been for many years and was a firefighter. He had issues with the tax team, etc. He had a co-worker who had a concern about police. The police appeared, showed up at his house, called on his telephone. He spoke to them, and he spoke to all of them for 15 minutes. And at the end of that conversation, he called some housemates and welcomed them outside. Mr. Wellman left his house, and once he was outside the house, he called some housemates in the corner. He voluntarily submitted to a mental evaluation. He did. He went up to the person in his hospital, and he submitted to a mental evaluation. It was commonly called a 96-hour call. After he had gone, I feel that this time he was taken up to the hospital for four days. The police entered Mr. Wellman's house without consent, without a warrant. You mean without his express consent? Yes. He'd left somebody in charge, and his sister was there too? No, he had left. He had a friend there in that house, in the Washington office. It's in the record telling me. I have Judge Simpson's opinion here. Yes. Didn't he say he's going to be in charge or something? What were his exact questions? No, he didn't. Well, what did he say? He left a friend there, Mr. James McNamara, to just watch the house. So he was there in the house, and after the police went inside the house, they searched it, and they confiscated this firearm collection. There were about 23 different firearms. Only the chief has been sued with respect to that. Yes. Well, the chief in St. Louis County. The chief in St. Louis County was having an actual seizure. Obviously, the chief wasn't out there. The chief was implementing the policies in St. Louis. What policy? That seems to me to be a big problem in this case. What's the policy? Is there a policy that says whenever there's a mental health home, you can go in and seize some firearms? What's the policy? Yes, there is a policy in St. Louis County, a special policy. And what that says is if the police are responding to what they identify as a suicide intervention, they take the firearms. So essentially what is happening is there's going to be two separate seizures. Well, I didn't see that in the brief. Because I didn't see the focus on Special Order 10-323, which I didn't see as simply authorizing a seizure. It's more of a retention of the Special Order. It is a retention. But also in paragraph 5, it talks about the seizure. That's page 2 and 3 of the index page 5. So when you talk about getting a firearm when seized, it's a pursuit to a suicide. It might be implicit, but it's not explicitly in Special Order 10-323. Well, and then also through Interim High Courts, both defendants admitted that they were taken and retained in pursuit of the official policy. And the real guts of this is there are two separate seizures. There's the initial seizure, and then there's the retention. And this court, quote, laid out in Walter's instance, that unlawful retention is a second seizure. And when that happens, that happens in pursuit of official policy, that includes deprivation of liberties that the county may come up with during the Court of Appeal. And we believe that's the primary point when the District Department and the District Law Enforcement care not recognizing that distinction. Now, before we get too far down the road, I did read it. It was a wife. I'm sorry, it was a sister. I said sister, but she said wife. Didn't they just voluntarily turn these guns over? The friend that was left there, the wife? And didn't she maybe even co-order the guns? No. She signed an affidavit, and she said it was in the record. She wasn't even there until after. Everything had already been rounded up. So I thought there was two seizures. I'm not talking about the retention. Right, right. That there was a—they come in, they go in, and I thought there was really not much dispute about them taking the first two guns. He had two loaded guns next to the easy chamber. Yes. And I didn't think that one was three. Was there any dispute about that seizure? No, there were two seizures. And then they go back a second time and seize the balance of the guns. Yes. And please say the wife said, fine, take them. I want them out of here. I mean, that's— Right, I understand. That's what they said. She signs an affidavit post-toxic. No, I didn't say that. Exactly right. Exactly right. So there are actually two separate seizures on December 28th, and then I think there's sort of this other seizure that occurs after this one requests his arm flexion recovered. It's the same kind of execution. And that's making an important distinction. Let me just make sure, though. So if a jury were to say—now, your argument, obviously, is that there's facts, but if a jury were to say, we believe the police officers, we don't believe the wifes, after the fact affidavit, then the seizure would be found. Yes, then there would be a consent if there was a factual dispute as to whether or not there was permission. But the wife that signed the affidavit said that she never believed the police. I don't know the facts. She showed up after the seizures that occurred. So the sentence hasn't been processed. But that would be a factual dispute. Did Mr.—in your affidavit, is this Mr. Mangan, I believe it is, say he called the police? Yes, he called the police. He was a friend of Mr. Sears' wife. And does he say he said he and the wife had located more guns than one police attorney? No. I can take that. No, that's Mr. Mangan's deposition. I'm not going to take it. In fact, there have been a few depositions in this entire case to officers and plaintiffs. So those are allegations that have been made in the police report. And that's it. That piece of work is not part of the affidavit. But I think the critical issue that this report got wrong was that these guns, at least if they weren't initially seen pursuant to the policy, they're absolutely routine, pursuant to the policy. And when that happens, then there's a well-connected violation and you bring it back to me. Well, isn't it sufficient if he shows up with a notarized, written statement? Yes. Isn't that sufficient? No, Your Honor, I think that's not sufficient because that is a post-deprivation remedy that the court will blame on it all since it isn't even going to be appropriate since these are pursuant to policy, official policy. Second, all this court has specifically said that filing a reprimand action would be a violation because that's a burden found in a tort action. The court said that. They sort of identified several different reasons why that would be a burden. The expense, the duration, and the uncertainty. And I think the exact same thing would apply to the St. Louis County's policy. Now, when the court or one of the attorneys argued that, well, all you can do is submit a letter, well, that's not legitimate and that's not true because we don't know that. They didn't try this. It's even in a statement. Well, I would argue, Your Honor, that because this seizure has occurred pursuant to official policy, post-deprivation remedies generally fail. And that's what this court has said to what was laid by the Walters. Well, I thought the key to Walters is they didn't have any, says the district court, any way by which you could contest it. Well, no. And they underlined any in the talents. In Walters, and in Latham and Bolton, it said that you could file for a clemency just like this case. In fact, I think it was almost the same policy that was challenged. Yeah, but it says any independent administrative procedure. We're clemency going to court, right? Right. Okay, leave aside going to court. Right. I thought that Walters and Mickelson and Latham all say there must be an independent administrative process. And that's enough. And when they were talking about that, they were talking about pre-deprivation issues. And that's when they sort of get into some of these balancing tasks. That's in a post-deprivation paragraph. Yeah, right. And the court recently addressed that issue in 2006, and they didn't propose it. And they more specifically said, we're not addressing post-deprivation issues. We're only talking about pre-deprivation issues. And they got into the balancing act. But the question is whether or not these guns were obtained or sent for fishing purposes. Isn't there a substantive question first, though, whether the retention of these and their missing? What cases do you have in support? Latham and Walters both say that. Are they a certain case? Yes, they're a certain case. Walters is 2-0-1, and Latham, what do you think that's going to be? Well, of course, the district court again says that there they no longer have a reason to hold them. Do they? And that's the key difference in our case where there is a reason. Well, I would argue that. Wait, wait, wait. They're at the scene. The person's acting very odd. Everybody agrees on that. Right. Your client admits to that. Right. I'm using nice words. Sure. Okay. So they got that, right? Right. Okay. And then they say, bring us a statement from somebody. You get your guns back that you're okay. Bring us a statement. Isn't that enough? No, it's not. And the court, the district court seemed to draw a distinction that I don't believe really exists. And that is the district court seemed to say that in Latham and in Walters. The police came into possession of those courts lawfully. But at some point, it became an unlawful possession. Right. So what has happened in the case before the bench is that they never had the lawful authority to take a munition. And once he has requested them back, do they need to give them back to him? Why don't they have the authority to take a munition? If he had come back from the hospital and shot himself or killed somebody else with one of those guns, you'd be having a lawsuit here saying the police shouldn't have seized him because we've had those kind of lawsuits. And I think that's a problem with the policy. Because the policy says you need to get a letter from the doctor and no doctor is going to write that letter. Well, I'm not talking – now you're shifting the focus. Why don't they – why doesn't a person who's threatening suicide, why doesn't the police have the right to take the guns away from him so he doesn't finish the act? Well, I'm mostly concerned about the failure to return the guns. But as far as their initial seizure, the court has set out some very clear exceptions to a warrantless search. Those are Hopper's suit. Those are the condition of a felony warrant that was contraband, you know, protection of somebody that's imminent. The Supreme Court addressed the issue in 2006 in the New England Police Department's decision to call, where they said, okay, the court can't give the police a warrant to make this arrest because they witnessed a fight and a crime that was imminent. This is not imminent. He had been sent to that hospital for four years. He could have checked himself out eight hours later. I don't know what the proceedings are and how he could check himself out. He was out there, and if the police thought that he was a threat, they could have been harassed and they could have received an injunction. Several other states have sort of taken this on. Florida has done this. The city of Seattle has done this, where they have pre-delegation hearings so that it can be processed by a way of violating the circumstances. So you're saying that the police cannot come in and take the guns away from a guy who's threatening to kill himself? I'm saying that if, well, in this situation, he was outside the house. So these are two guns he's got sitting next to the easy chair loaded, and he's telling his friend, over many hours, I'm going to kill myself. Well, that's disputed. No, that part is not disputed, as I understand it. In his deposition, he said that he never made any threats, and also now he's making threats against other people, or himself. Or himself, and that's in page 105. Well, then why did the friend call him to say that? He was worried about him. He was worried about him. But the crux of where I think the district court got this wrong was not recognizing that this containment possession was pursuant to official powers. And it doesn't matter what privilege the county may have, there's been a violation. Thank you very much. Very well. Good morning, Mr. Gingrich. Good morning. May it please the court, Mr. Gingrich, I represent Chief John Belmar. He's a student that's in critical capacity. I don't know if that's what he's talking about. One of the questions that was asked, I wrote it in Chief Belmar half. The first minute complaint is alleged that he's the chief of police. Nothing else is alleged against him. He has a special order 11-334, right? He has a special order 11-334, release of firearms, right? Yes. So it's got to be that policy in this case, lives or dies, right? And you're right. There is a reason to hold him justice. There is a reason to continue the violence. And this specific policy, by the way, is the title of the policy and the body of the policy is how to address the violence in one space. And policy has nothing to do with taking weapons away from someone. It has nothing to do with this issue. It has to do with the release of weapons. Now, I haven't read the depositions, so I have to go on to the counsel's side. The counsel's representative did depositions. It was admitted that there was this account of policy to seize weapons from people who were threatening suicide. No, there's absolutely no weapons. And what's really important here is— Well, now, counsel, isn't it implicit that there's some kind of policy because the policy begins, if a firearm is seized, passive, I get it, but still is seized pursuant to suicide or the person is voluntarily or involuntarily committed where a firearm was seized. That's what it says to start. Doesn't that imply that there's authority to seize them when there are those circumstances? Well, one of the people who posed in this case was a sergeant, and he testified, and this is a admitted statement of fact, that it was completely his judgment call to seize. You know, when there was danger, he acted in the face of danger, and he had exigent circumstances. He thought he had consent to go into the house and once he went in, whether he did or not, there were exigent circumstances. The fire chief had called the police. His friends had called the police. They all stayed about a block away. He did have two weapons next to him. They were both automatic weapons. AR, rifle, automatic pistol. So the semi-automatic. Can I ask a question with respect to the chief? I think Mr. Burr suggested that there was a different special order that he had authorized the initial seizure. Is there a difference? No, there is no order of that special order. So the only question is whether Levin asked you to authorize the initial seizure. Yeah, but I realized it says what is the procedure for release of weapons taken in a suicide attack in and of itself wasn't a policy that any officer relied on. It's the title of it and the body of it is going to do what it's supposed to do. So just, and maybe it's not for other purposes at this point, but when you say in your brief that Jim Mangan, that was the individual who was left in New York, was left in Germany, right? Yes. You say that he called the police station and said, please come back and find more weapons on the monitor. Yes. And that's the reason he didn't come back. Well, I thought that would be. Well, in the statement of facts that were submitted, that were submitted, it's just not in dispute. Well, is that not in dispute? That he called. Right, and said to get rid of these weapons. Well, that is not in dispute that he called and said something that we haven't scratched the surface, we want officers to come back and take all the other weapons. Then that's not in dispute. I don't understand why he wouldn't be talking about the procedure. Maybe I'm missing something. It's not in dispute. He called 911 and said come back. Okay, and there was the police officer of Whiteside who accompanied Mr. Baldwin to the hospital. He's just sitting at the hospital. And, by the way, he's watching his friend go out to the medical house and everything, but he's sitting at the hospital and he gets the dispatch. It's a 911 call and he gets the dispatch and he can't come back to the house because the family or someone wants the police to come back and get the weapons. And with regard to the affidavit of Denise Wellman, that was very well crafted, but it did not say, by the way, that the police searched her house and the fact that they did not. It just said she did not get consent to search the house. It did not say that the police gathered the firearms and the fact that they did not. It just said she did not get the firearms. The affidavit did not dispute that police officer of Whiteside was there, which is an admitted fact, that she said she was worried about her safety and her husband's safety. And the affidavit did not say that she told the officers not to remove the weapons. With regard to the procedural due process for returning the weapons, as Mr. Earn stated today and as he stated in his brief, once his client requests weapons to be returned, he thinks they have to be returned. Despite these mental health issues, despite the fact that his client was told by his fire chief that he can't come back to work until he gets treatment, despite the fact that his wife, despite the fact that he was hospitalized, we assume he didn't give us medical records. We assume there's a 96-hour commitment, but in his deposition he said, I think it was long, and after that he had to get counseling before he could return to work, employee's assistance program, and even then the lawyer did not allow him to come back to work until he was seen by a psychiatrist. Now, you agree if your policy required a written reply to get it back, it would be unconstitutional not to wait three to four months, which is right? Well, yes, if that's all it did, but it has another remedy in place. But you think it's enough if it goes ahead and says, if you come in with a notarized written statement from a treating psychiatrist and a treating psychologist, and the person is no danger, you think that's enough to make it constitutional? Yes, sir. I mean, I guess policies are always changing. I guess we could have some license to be a social worker, but the point is the police department never fought this. The police department never actually refused to return the weapons. He never showed up and asked them to have the weapons returned. Any time he talked to a police officer, they would be professional and helpful. And if he had ever shown up at the property, they would get the weapons back. If he didn't have a letter, they would have been helpful and said, this is all you have to do, put an S in it. He does have due process. He does have the right to be heard. All he has to do is put an S in the letter. You could also file a civil written complaint. But that's not enough. That's what Latham and Walters said. If you require him to go to court, that is not a sufficient criminal charge. Well, I think that's pretty much what Walters and Latham said. But again, Latham, you've got to remember that they absolutely refused. Not only that, they sent the weapons that were retrieved, not just in the city of St. Louis, but in three other counties. And so they would have had to file four complaints. And then Walters, the chief of police specifically, refused to return the weapons. And he said under any circumstances. So he had no other remedy. But here, he did refuse, and he had no other remedy. I think that's all I can say. I think Mr. Harmer's word this evening that the force of method claim isn't something he's pursuing completely. But with regard to that, Chief Belmar, governmental officials only liable for their own misconduct. In St. Louis County, there's no spot yet to enter court. There must have been an unconstitutional policy that was a rule of force. And there is no underlying force of method claim to begin with. If there was any, I don't think that's at this point. It's a dangerous problem put to action by the police. I don't think that's at this point. And everything the police have done objectively is for the purpose of the state. There's no other reason. The police recruited logical, reasonable circumstances. And I think with the return to the weapons, they're trying to be logical and reasonable. One of the issues, I think, in Latham, and I'll probably ask both counsel, Latham refers to, basically says, requirement is not an adequate remedy if the seized weapons were legally possessed by the owner. Now, does not 922 change anything with the subsection of the federal code prohibit a person with mental illness from possessing a weapon? That's the point. I believe that there is a prohibition against a person who has mental illness from possessing firearms. I'm not sure that, you know, and I can see it hasn't been agreed, but I don't know. I don't know how to talk about that. There is a, there is a, it's my understanding, a prohibition if you have mental illness from having firearms. Thank you. We're here to help. I'll be glad to answer any questions, whatever they may be. Thank you, Mr. Chairman. Yes, sir. But he wouldn't give him the sheet of paper. Yes, sir. It kind of sounds like they don't have a choice. Approval will be received from him. It's very poorly worded. It sounds like the county council boss has to approve it. Regardless. The judge will always question whether or not there is a prohibited owner or possessor of a firearm. It would not be, in fact, he purchased a firearm shortly after this because there has to be an adjudication that the person is mentally ill. There has been no adjudication in mental health. Other than him going up to Christian Heart Institute and staying in contact with any mental health providers in his entire life. So there's never been an adjudication that he was mentally ill just in his entire lifetime. Very well. Thank you, Mr. Chairman. The council court appreciates your arguments here today and for your coming here to the law school for us. It's been a pleasure.